UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------- x
                        :

STEPHANIE LUNA,                   :

                        :

              Plaintiff,       :

                        :

       -against-          :

                        :

NYC TAXI AND LIMOUSINE COMMISSION,  :
DIANNA M. PENNETI, CARMEN ROJAS,  :
RONALD SOBERS, IRA GOLDAPPER,    :
EDWIN CARABALLO *or* CARABIALLO,  :
EDWIDGE JOSEPH, LINDA ANDREWS,   :
JOSE TORRES, MANUEL MATEO, KELLY,  :
NOREEN HOLLINGSWORTH, SYLVESTER  :
ATUEGBU, MAJORIE VICHINSKY, and   :
GAVIN CRANDON,                 :

                        :

           Defendants.      :

                        :

                        :

-------------------------------------------------------------- x

**REPORT AND
RECOMMENDATION**

21-CV-1408 (DG)(PK)

**Peggy Kuo, United States Magistrate Judge:**

      Stephanie Luna[1] ("Plaintiff") brought this action against the New York City Taxi and

Limousine Commission ("TLC"), Dianna Pennetti,[2] Carmen Rojas, Ronald Sobers, Ira Goldapper,

Edwin Caraballo, Edwidge Joseph, Linda Andrews, Jose Torres, Manuel Mateo, Shaun Kelly,[3] Noreen

Hollingsworth, Sylvester Atuegbu, Marjorie Vichinsky, and Gavin Crandon (collectively,

"Defendants"), alleging gender discrimination and various other claims related to her employment by

the TLC. (*See* Compl. at ECF pp. 9, 14, Dkt. 1.)  Before the undersigned on referral from the

---

[1]  Stephanie Luna is Plaintiff's maiden name.  She is also referred to in documents as Stephanie Kooma.  (Dkt. 1 at ECF p. 31.)

[2]  The undersigned adopts the spelling used by Defendants.

[3]  Although Defendant Kelly's full name is not used in the Complaint, he is identified as "Shaun Kelly" in the Motion.  (*See* "Defs. Mem. in Supp." at 7, Dkt. 18-3.)

Honorable Diane Gujarati is a Motion to Dismiss ("Motion," Dkt. 18) filed on behalf of the TLC, Pennetti, Rojas, Goldapper, Caraballo, Joseph, Andrews, Torres, Atuegbu, Vichinsky, and Crandon (collectively, "Moving Defendants").[4]

For the reasons set forth below, the undersigned respectfully recommends that the Motion be GRANTED.

## FACTUAL BACKGROUND

### I. Consideration of Materials Outside the Pleadings

Although courts generally "do not consider matters outside the pleadings" when evaluating a motion to dismiss under Fed. R. Civ. P. 12(b)(6), *Fillmore E. BS Fin. Subsidiary L.L.C. v. Capmark Bank*, 552 F. App'x 13, 15 (2d Cir. 2014) (internal quotation marks omitted), "[a] complaint is also deemed to include any written instrument attached to it as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are integral to the complaint." *Cohen v. Rosicki, Rosicki & Assocs., P.C.*, 897 F.3d 75, 80 (2d Cir. 2018) (citation omitted). "Moreover, '[a] court may take judicial notice of a document filed in another court not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings.'" *Skates v. Inc. Vill. of Freeport*, No. 15-CV-1136 (SJF)(AYS), 2016 WL 1459659, at *1 (E.D.N.Y. Jan. 28, 2016) (alteration in original) (quoting *Glob. Network Commc'ns, Inc. v. City of N.Y.*, 458 F.3d 150, 157 (2d Cir. 2006)), *R&R adopted*, 2016 WL 1452391 (E.D.N.Y. Apr. 12, 2016).

Plaintiff filed the Complaint (Dkt. 1 at ECF pp. 1-14) *pro se* and attached various documents, including: the complaint that Plaintiff addressed to the New York State Division of Human Rights (the "NYSDHR") and signed on October 5, 2019 ("SDHR Compl.," Dkt. 1 at ECF pp. 16-25); a letter to Plaintiff from the New York State Division of Criminal Justice Services ("DCJS"), dated May 26,

---

[4] Counsel for Moving Defendants did not enter an appearance on behalf of Sobers, Mateo, Kelly, and Hollingsworth but argues that service as to those defendants was defective, as discussed below. (*See* Notice of Appearance dated Aug. 9, 2021, Dkt. 12.)

2020 ("DCJS Letter," Dkt. 1 at ECF p. 30), and Plaintiff's letter in response to it, dated November

26, 2020 ("Pl. Letter to DCJS," Dkt. 1 at ECF p. 31); Plaintiff's letter of resignation from the TLC

dated August 30, 2019 ("Pl. Resignation Letter," Dkt. 1 at ECF pp. 32-33); an unsigned Stipulation of

Settlement between Plaintiff and the TLC ("Stip. of Settlement," Dkt. 1 at ECF pp. 34-35); TLC

policies regarding shields, ID cards, and annual leave (Dkt. 1 at ECF pp. 36-44); Plaintiff's Right to

Sue Letter from the U.S. Equal Employment Opportunity Commission ("EEOC"), dated December

28, 2020 (Dkt. 1 at ECF p. 45); and Plaintiff's performance evaluations, including attendance and leave

records, and emails related to the performance evaluations for 2015 ("2015 Evals.," Dkt. 1 at ECF pp.

46-66) and 2016 ("2016 Evals.," Dkt. 1 at ECF pp. 67-68).  Because these documents were attached

to the Complaint, the facts contained in them are considered and accepted as true for purposes of

evaluating the Motion.  *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002).

In support of the Motion, Moving Defendants filed the Declaration of Rachel M.

DiBenedetto, dated August 9, 2021.  ("DiBenedetto Decl.," Dkt. 18-1.)  Attached as an exhibit to the

declaration is a copy of the NYSDHR's Determination and Order After Investigation, dated June 12,

2020, dismissing Plaintiff's SDHR Complaint after determining that there was no probable cause to

believe that the TLC engaged in the unlawful discriminatory practices alleged.  ("SDHR

Determination," Ex. A to DiBenedetto Decl., Dkt. 18-2.)  I take judicial notice of the SDHR

Determination not for the truth of the matters asserted therein but to establish the facts that Plaintiff

filed the SDHR Complaint with the NYSDHR on October 21, 2019, and that, in response, the

NYSDHR issued a "no probable cause" finding on June 12, 2020.[5]  (*See* SDHR Determination at 1.)

*See, Skates*, 2016 WL 1459659, at *1.

---

[5]  In compliance with Local Civil Rule 12.1, Moving Defendants attached to the Motion a Notice to Pro Se Litigant Who Opposes a Rule 12 Motion Supported by Matters Outside the Pleadings, and the full text of Federal Rule of Civil Procedure 56.  The notice informs Plaintiff that Moving Defendants have moved to dismiss this case, submitted additional written materials, and asked the Court to decide this case without a trial, based on these written materials.  The notice warns Plaintiff that the Court may convert the Motion to a motion

### A.      The Parties

The TLC "is the agency of the New York City government that licenses and regulates the medallion taxis and for-hire vehicle industries." (SDHR Compl. ¶ 1.) The individual defendants are or were employed by the TLC in various positions. (Compl. at ECF pp. 2-6.)

Plaintiff was hired by the TLC as an Officer in July 2012 and worked there until September 3, 2019, when she resigned. (Compl. at ECF p. 9; Pl. Letter to DCJS; Pl. Resignation Letter at ECF p. 32.)

### B.      Plaintiff's Pregnancy in 2013

After completing cadet training, Plaintiff was assigned to the overnight tour. (Compl. at ECF p. 9.) As part of her duties, Plaintiff was required to conduct car stops, which she considered dangerous. (*Id.*) Plaintiff conducted those stops "safely and according to the training" she received. (*Id.*) When she spoke up about car stops which were "not conducted according to policies and procedures," Captain Rodriguez told her she "was being difficult."[6] (*Id.*)

In 2013, when Plaintiff became pregnant, she presented a doctor's note to the TLC "requesting a change of tour and light duty" due to the pregnancy. (*Id.*) Male officers were "routinely granted tour changes based on their girlfriend or wives' pregnancies." (SDHR Compl. ¶ 3.) Assistant Commissioner of Human Resources Rojas told Plaintiff, "You chose to get pregnant, we don't have to accommodate you." (*Id.*; *see* Compl. at ECF p. 10.)

---

for summary judgment under Rule 56, in which case Plaintiff must timely respond to the converted motion with sworn affidavits and/or other documents—otherwise, the Complaint may be dismissed without a trial. (*See* Motion ¶¶ 1-4.) Moving Defendants do not request that the Court convert the Motion to a motion for summary judgment, and the undersigned finds no reason for the Court to do so.

[6] "Captain Rodriguez" is not named as a defendant in the Complaint or as a respondent in the SDHR Complaint.

Plaintiff was assigned to the radio room "but continued on the overnight tour." (Compl. at ECF pp. 9-10.) Captain Rodriguez told Plaintiff that she had to wear a uniform even though she was pregnant. (*Id.* at ECF p. 10.) Plaintiff observed three female officers who were not required to wear uniforms during their pregnancy. (*Id.*) Other employees in the radio room were not required to wear a uniform. (SDHR Compl. ¶ 4.) When Plaintiff asked Rodriguez why she was the only employee required to wear a uniform, Rodriguez "threatened to extend [her] probation period by if she refused to wear the uniform." (*Id.*)

Plaintiff occasionally read books during her radio room shifts. (SDHR Compl. ¶ 5.) TLC policy "allowed employees to read in the radio room as long as it did not interfere with transmissions." (*Id.*) Rodriguez told Plaintiff that she was "only allowed to read TLC policy and procedures reading material." (Compl. at ECF p. 10.) When Plaintiff asked whether she would be allowed to read books if she were in school, Rodriguez replied that TLC would make an accommodation for that but not for pregnancy. (SDHR Compl. ¶ 5.) Rodriguez "directed Lieutenant Arias to observe the material [Plaintiff] was reading."[7] (*Id.*)

Plaintiff requested to be relocated to another department as an accommodation for her pregnancy. (Compl. at ECF p. 10.) TLC Department Chief Sobers stated that she "can only work in the radio room due to [her] officer title." (*Id.*) However, "[t]hree officers were assigned to positions outside the radio room during their pregnancy." (*Id.*) Plaintiff alleged that Sobers denied the request "without explanation," stating that Plaintiff's pregnancy "could not interfere" with her work. (SDHR Compl. ¶ 3.) Sobers then "forced [Plaintiff] to attend Car Stop training, a physical training held outdoors that required standing for long periods of time, while she was seven months pregnant." (*Id.*)

C.    **Defendants' Statements and Actions in 2017**

---

[7] "Lieutenant Arias" is not named as a defendant in the Complaint or as a respondent in the SDHR Complaint.

At some point in 2017, Captain Atuegbu shoved Plaintiff in the back following a meeting. (SDHR Compl. ¶ 6.) When Plaintiff asked Atuegbu not to shove her, he replied, "that's the way I play." (*Id.*) Atuegbu's behavior "continued thereafter, including but not limited to, yelling at [Plaintiff] and behaving aggressively towards her." (*Id.*)

In June or July 2017, Rodriguez "inquired into [Plaintiff's] marital status during work." (SDHR Compl. ¶ 7; Compl. at ECF p. 10.) Rodriguez stated, "Congratulations, I heard you and James are married?" (Compl. at ECF p. 10.) Plaintiff "refused to answer, but Rodriguez continued to ask inappropriate personal questions." (SDHR Compl. ¶ 7.)

In July 2017, Plaintiff received a negative performance evaluation for 2016 which claimed she "created turmoil."[8] (SDHR Compl. ¶ 8.) Plaintiff attended a meeting with Deputy Chiefs Andrews and Torres, Assistant Chief Hollingsworth, Captain Atuegbu, and Lieutenants Vichinsky and Crandon to discuss the "inaccurate performance evaluation." (*Id.*; Compl. at ECF p. 10.) Plaintiff was not informed of her "rights [to] a union rep[resentative], a witness and/or representative." (Compl. at ECF p. 10.) Plaintiff learned during the meeting that the evaluation was based on only three months of evaluations from Vichinsky. (SDHR Compl. ¶ 8.) In addition, Crandon claimed that "officers said they don't want to ride with you." (*Id.*) Plaintiff's evaluation "should be based solely on [Vichinsky's] comments, not [those of] other officers." (*Id.*) The TLC also "refused to show [Plaintiff] the alleged complaints from the officers." (*Id.*)

In August 2017, Plaintiff's locker was vandalized with the word "LOSER" scratched into the front side. (SDHR Compl. ¶ 9.) Plaintiff reported the vandalism to Department Chief Sobers and Lieutenant Rivera, but neither of them investigated the incident. (*Id.*)

---

[8] Plaintiff's evaluation states that "she has become a distraction among her peers, at times ca[]using dissension." (2016 Evals. at ECF p. 67.)

In December 2017, Plaintiff met with Director of Labor Relations and Discipline Investigator Goldapper to discuss her time and leave usage. (SDHR Compl. ¶ 10.) During the meeting, Goldapper "accused [Plaintiff] of falsifying sick notes and faking illnesses," and asked her personal questions, including who she carpooled with. (*Id.*) He also "questioned [Plaintiff's] status with James McMillian."[9] (Compl. at ECF p. 10.) When Plaintiff stated that she did not understand the questions, which did not relate to time and leave matters, Goldapper told her that she "[didn't] have to understand the questions." (*Id.* at ECF p. 11) Although she was told she would have the right to ask questions, when she tried to ask a question, Goldapper responded, "'Go ask Mr. McMillian,'" and ended the meeting. (*Id.*)

Plaintiff states that she "participat[ed] as a potential witness in James McMillian's SDHR case" and alleges that the TLC retaliated against her because of that participation. (SDHR Compl. ¶ 26.) No further description of McMillian's case is provided.

###    D.    Plaintiff's Illnesses and TLC's Denial of Medical Leave Requests

In early 2018, Plaintiff "faced child care issues that caused her to be out of work for some time. [She] was also sick and overwhelmed with stress during the month of February 2018." (SDHR Compl. ¶ 11.) Plaintiff alleges that the TLC "later used this against her when charging her with excessive absenteeism." (*Id.*)

In 2018, Plaintiff filed for leave under the Family and Medical Leave Act ("FMLA") "to treat an illness." (SDHR Compl. ¶ 12.) Chief Joseph denied her request and, later, the TLC posted notes on the tour desk in bolded red and black ink, "that stated that [Plaintiff] was not allowed to call out of work and that call out[s] must be directed to [a] supervisor." (*Id.*) These notes were visible to Plaintiff's colleagues, and Plaintiff claims they were "an effort to harass and embarrass her." (*Id.*)

---

[9]  In an unsigned draft settlement agreement attached to the Complaint, James McMillian is listed as Plaintiff's "Representative." (Stip. of Settlement at ECF p. 35.)

Plaintiff alleges that "[i]n May 2018, the [TLC] denied [Plaintiff's] FMLA leave request without cause" (SDHR Compl. ¶ 17), and in September 2018, when Plaintiff "requested a temporary, emergency leave period to care for an illness," the TLC told her that "if she took a leave of absence, [the TLC] would consider it job abandonment." (*Id.* ¶ 16.) Plaintiff does not specify if these denials were the same ones that resulted in the posting of the notes.

### E.    Plaintiff's Working Conditions and Accusations Against Her in 2018 and 2019

In 2018, the TLC assigned Plaintiff to a joint operation with the New York Police Department. (SDHR Compl. ¶ 13.) Captain Robinson "attempted to force [Plaintiff] to work without a partner."[10] (*Id.*) When Plaintiff "told Robinson she felt unsafe without a partner," Chief Mateo "called [Plaintiff] and asked whether she disobeyed Robinson's order." (*Id.*) When Plaintiff "explained that she was not refusing the order, just stating that it was unsafe," Mateo responded, "Do you go home with your partner? Why are you asking to go in an NYPD vehicle with your partner?" (*Id.*) Mateo then ordered Plaintiff to return to headquarters and later sent her home without pay. (*Id.*) Plaintiff described incidents in which other officers "were involved in accidents with joint operation with NYPD without their partners." (Compl. at ECF p. 10.)

Plaintiff was "summoned" to a conference with a Hearing Officer "regarding Mateo's false allegation of insubordination." (SDHR Compl. ¶ 14.) The TLC stated that, as a result of Plaintiff's actions, the operation could not be completed. (*Id.*) Although Plaintiff elected to undergo an OATH hearing[11] rather than be placed on unpaid suspension, the TLC did not conduct a hearing. (*Id.*)

In August 2018, Officer Booker, who is male, complained about having to participate in "street hail" operations, in which TLC officers "act as decoys with luggage and attempt to hail taxis." (*Id.* ¶

---

[10] "Captain Robinson" is not named as a defendant in the Complaint or as a respondent in the SDHR Complaint.

[11] Presumably before the New York City Office of Administrative Trials and Hearings.

15.)  He was "immediately accommodated . . . by changing his placement" and "on multiple occasions at various locations such as Manhattan and the Bronx regarding his summonses."  (*Id.*)  Plaintiff, however, was required "to continue conducting street hail operations in poor conditions and standing long hours."  (*Id.*)

In October 2018, Joseph issued Plaintiff a written citation stating that she "fail[ed] to complete her job in a competent manner."  (SDHR Compl. ¶ 18.)  "The citation was admittedly based on [Plaintiff's] Time and Leave Usage."  (*Id.*)  Joseph refused Plaintiff's request to have her union delegate present to discuss the citation and "falsely claimed that [Plaintiff] refused to sign the citation."  (*Id.*)

In 2019, after Plaintiff "was nearly struck by a speeding taxi after completing a traffic stop," she asked to be allowed to go home for the day.  (SDHR Compl. ¶ 19.)  Robinson denied her request, directing her instead to "work the tour desk" and later inappropriately asked her, "'What's wrong with you?'"  (*Id.*)

In May 2019, after multiple taxis nearly struck Plaintiff during a street hail operation in the Bronx, Robinson refused Plaintiff's request to move the operation to a different location, despite Plaintiff's safety concerns.  (*Id.* ¶ 20.)

In June 2019, "Mateo forced [Plaintiff] to complete an arrest of a taxi driver without a partner, equipment, or vehicle."  (*Id.* ¶ 21.)  Mateo allowed Plaintiff's male partner to leave work early instead of assisting her in the arrest.  (*Id.*)

### F.    Denials of Plaintiff's Childcare-Related Requests in 2019

In 2019, Plaintiff requested that she be assigned to the morning tour in order to care for her child.  (SDHR Compl. ¶ 22; Compl. at ECF p. 11.)  Tour assignments were determined based on "seniority, activity[,] and time and leave."  (Compl. at ECF p. 11.)  When Plaintiff's squad of eight officers was being split up, six officers were assigned to the morning tour and two to the overnight

tour.  (*Id.*)  Plaintiff and another officer outranked the others in seniority and activity, yet Torres and Kelly assigned Plaintiff to the overnight tour.  (*Id.*; *see* SDHR Compl. ¶ 22.)

Plaintiff attended a grievance conference with Torres and Kelly regarding the denial of her request.  (Compl. at ECF p. 11.)  Plaintiff was told that her request was denied because of two pending charges against her.  (*Id.*)  Torres told her, "'To be real, there's another choice, this agency is what it is, people come and people go, you can always choose to resign.'"  (*Id.*; SDHR Compl. ¶ 22.)  Plaintiff told Kelly that "being assigned to overnight duty affected her ability to care for her child." (SDHR Compl. ¶ 22.)  Kelly stated, "The new management takes [childcare] very serious[ly]," but he denied Plaintiff's request.  (Compl. at ECF p. 11; SDHR Compl. ¶ 22.)

On July 26, 2019, after Plaintiff completed an arrest during the overnight tour, Andrews and Joseph "attempted to force [Plaintiff] to stay passed [sic] the end of [her] tour."  (Compl. at ECF p. 11; SDHR Compl. ¶ 23; Pl. Resignation Letter at ECF p. 33.)  Andrews told Plaintiff that she could wait until the morning to deliver the arrest documents to the District Attorney's Office or she could fax the documents and wait for a call.  (SDHR Compl. ¶ 23.)  Plaintiff elected to fax the documents because she could not wait until the morning due to her need to care for her child.  (*Id.*)  Andrews then told Plaintiff that she "had to physically go to the office to deliver the arrest documents."[12]  (*Id.*)  When Plaintiff explained that she could not go because she needed to care for her child, Andrews contacted Joseph, who warned Plaintiff that if she did not go, "'there would be consequences.'"  (*Id.*) Joseph later told Plaintiff, however, that she could go home.  (*Id.*; Compl. at ECF p. 11 ("Captain Joseph dismissed me and I proceeded to the locker room.").)  As Plaintiff was leaving the building, Andrews "pulled her aside and aggressively requested" her officer shield and ID card.  (SDHR Compl. ¶ 23.)  Plaintiff asked for her union delegate to be present, but Andrews refused.  (*Id.*)  Joseph arrived

---

[12] In the Complaint, Plaintiff alleges that Andrews told her she "need[ed] to make some calls and stated, [']You can take care of the arrest via fax and or phone call['] …. She then changed her mind and refused to allow [Plaintiff] to complete the arrest via phone or fax."  (Compl. at ECF p. 11.)

and yelled at Plaintiff to turn over her shield and ID.   (*Id.*)   When Plaintiff refused, Joseph stated, "'You are disobeying a direct order, have a nice day,'" and pointed to the exit.   (*Id.*)   Neither Joseph nor Andrews provided a reason for demanding Plaintiff's shield and ID card.   (Compl. at ECF p. 11.) "At that moment," Plaintiff states she "was literally against the wall being verbally attacked."   (*Id.*)   She alleges that they "violated my human rights and my rights as an officer of the City of New York."   (*Id.*)

The next day, Plaintiff called in sick.   (SDHR Compl. ¶ 24.)   However, the TLC told her that her sick day was denied and that she had to return her shield and ID.   (*Id.*)   Kelly told Plaintiff on the phone, "'We are coming to your house with NYPD to pick up your [s]hield," and accused her of being a criminal.   (*Id.*)   Plaintiff heard Pennetti in the background yell, "Go get the shield, end of conversation."   (*Id.*)   Later that day, Mateo and Kelly went to Plaintiff's home and took Plaintiff's shield and ID.   (*Id.*)   Plaintiff was placed on unpaid suspension for thirty days.   (*Id.*; Compl. at ECF p. 11.)

### G.      Plaintiff's Resignation

On September 3, 2019, Plaintiff resigned from the TLC.   (Pl. Letter to DCJS at ECF p. 31; *see* Pl. Resignation Letter at ECF p. 32; SDHR Compl. ¶ 25.)   In her letter dated August 30, 2019, she quoted Goldapper as stating in an email that "it would be advantageous for [Plaintiff] to resign as part of a settlement to the pending charges, rather than just resign."   (Pl. Resignation Letter at ECF p. 32.) He further stated, "If [Plaintiff] resigns with pending disciplinary charges, her record will indicate resignation pending disciplinary action."   (*Id.*)   Plaintiff wrote, however, that she "cannot sign off on this forced 30 day suspension settlement" because she was "not in agreement, especially due to the unprofessional investigation" during which she was not interviewed.   (*Id.*)

Plaintiff further stated that she "fell into a depressive state" after Torres told her she could choose to resign if she did not want to work the overnight shift and also because of the "mistreatment [she] experienced during [her] service with the agency."   (*Id.* at ECF p. 33.)   She stated, "The

11

mistreatment started as I began standing up for my safety, which is my human right." (*Id.*) Citing the incident on July 26, 2019 with Andrews and Joseph, Plaintiff also stated, "I was becoming depressed prior to July 26th of 2019 due to the many incidents at the agency." (*Id.*) She stated, "This unfair practice within TLC's workplace has left me with no other option other than to resign for my own safety and well being." (*Id.*) Plaintiff alleges that her resignation "amount[ed] to a constructive discharge." (SDHR Compl. ¶ 25.)

By letter dated May 26, 2020, DCJS informed Plaintiff that the TLC notified it on April 21, 2020, that, effective September 3, 2019, Plaintiff "ceased to serve [the TLC] due to incompetence or misconduct pursuant to section 9 NYCRR Part 6056.2(h)." (DCJS Letter at ECF p. 30.) As a result, her peace officer basic training certification was invalidated. (*Id.*)

## H.   Additional Undated Incidents

Plaintiff alleges that Joseph "displayed unprofessional and hostile behavior" toward Plaintiff, in that, "[o]n three different occasions, he stormed out of meetings and refused to answer questions." (Compl. at ECF p. 10.) No dates are provided for these incidents.

## **PROCEDURAL HISTORY**

Plaintiff, through counsel, filed a verified complaint with the NYSDHR on October 21, 2019, charging the TLC with discrimination based on gender and familial status as well as retaliation, in violation of "Human Rights Law § 296, *et seq.*, NYC Admin. Code § 8-107, together with Title VII of the Civil Rights Act." (SDHR Compl. ¶ 30; *see* SDHR Determination at 1.) On June 12, 2020, the NYSDHR issued a "no probable cause" determination. (*See* SDHR Determination at 3.) The SDHR Determination informed Plaintiff that she had the right to appeal the determination to the New York State Supreme Court within 60 days. (*Id.* at 2-3.) It also stated that she could request EEOC review of the determination as it related to her Title VII claims, but that if she failed to request such review within 15 days, the EEOC "will generally adopt [the NYSDHR's] action in [her] case." (*Id.* at 3.)

In a Dismissal and Notice of Rights, dated December 28, 2020, Plaintiff was notified that the EEOC had adopted the findings of the NYSDHR and she had a "right to sue" under Title VII in federal or state court. (Dkt. 1 at ECF p. 45.)

Plaintiff filed the Complaint, *pro se*, on March 15, 2021. In lieu of an Answer, Moving Defendants filed the Motion, seeking to dismiss all claims under Fed. R. Civ. P. 12(b)(6). (*See* "Defs. Mem. in Supp.," Dkt. 18-3.) Plaintiff filed a response ("Pl. Opp.," Dkt. 19), and Moving Defendants filed a reply ("Defs. Reply," Dkt. 20). The Honorable Diane Gujarati referred the Motion to the undersigned for a report and recommendation. (Order dated Apr. 26, 2022).

## DISCUSSION

### I.    Legal Standard for Motions to Dismiss

Federal Rule of Civil Procedure 12(b)(6) provides that a complaint may be dismissed for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In deciding a 12(b)(6) motion, a court must take all of the factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., L.L.C.*, 797 F.3d 160, 169 (2d Cir. 2015).

To survive a Rule 12(b)(6) motion, the plaintiff's allegations must be supported by "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). Although "detailed factual allegations" are not required, a complaint must contain more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555. "Naked assertion[s]" absent "further factual enhancement" are inadequate to successfully state a claim. *Id.* at 557. "A complaint is properly dismissed where, as a matter of law, 'the allegations in a

complaint, however true, could not raise a claim of entitlement to relief.'" *Hayles v. Aspen Props. Grp., L.L.C.*, 782 F. App'x 3, 5 (2d Cir. 2019) (citation to summary order) (quoting *Twombly*, 550 U.S. at 558).

"[A] pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam) (citation omitted). "Pro se filings are liberally construed to raise the strongest arguments they suggest." *Montgomery v. NBC Television*, 833 F. App'x 361, 363 (2d Cir. 2020) (citation to summary order). To survive a Rule 12(b)(6) motion to dismiss, however, a *pro se* plaintiff's factual allegations must be at least "enough to raise a right to relief above the speculative level." *See Twombly*, 550 U.S. at 555.

The Complaint pleads the following purported causes of action without reference to specific statutes: "gender discrimination," "forced resignation," "defamation of character," "harassment," "retaliation," "false (malingering) accusations," and "violation of seniority." (Compl. at ECF p. 9.) In the section of the Complaint seeking relief, Plaintiff adds "perjury" and "violation of human rights/improper & state investigation." (*Id.* at ECF p. 14.)

## II.   Moving Defendants' Procedural Arguments for Dismissal

In addition to arguing that Plaintiffs claim should be dismissed on the merits, Moving Defendants make three procedural arguments in support of dismissal: (1) Plaintiff's claims against Sobers, Mateo, Kelly, and Hollingsworth should be dismissed because service of process on those named defendants was defective (*see* Defs. Mem. in Supp at 7); (2) Plaintiff's gender discrimination, hostile work environment, and retaliation claims under the New York State Human Rights Law ("NYSHRL") and New York City Human Rights Law ("NYCHRL")—to the extent Plaintiff brings such claims in the Complaint—are barred by the "election of remedies" doctrine, which divests the Court of subject-matter jurisdiction over the claims, and are limited by the three-year statute of limitations applicable to the claims (*see id.* at 7-9, 10); and (3) any underlying conduct that could form

14

the basis of a Title VII claim against Moving Defendants is time-barred to the extent that alleged acts occurred prior to December 25, 2018, *i.e.*, 300 days prior to October 21, 2019, the date Plaintiff filed the SDHR Complaint (*see id.* at 9-10).

### A. Defective Service of Process on Sobers, Mateo, Kelly, and Hollingsworth

Moving Defendants argue that Plaintiff failed to properly serve Defendants Sobers, Mateo, Kelly, and Hollingsworth.

> [A]n individual . . . may be served in a judicial district of the United States by: (1) following state law . . . ; or (2) doing any of the following: (A) delivering a copy of the summons and of the complaint to the individual personally; (B) leaving a copy of each at the individual's dwelling or usual place of abode with someone of suitable age and discretion who resides there; or (C) delivering a copy of each to an agent authorized by appointment or by law to receive service of process.

Fed. R. Civ. P. 4(e). Section 308(2) of the New York Civil Practice Law and Rules permits a plaintiff to effect "[p]ersonal service upon a natural person … by delivering the summons within the state to a person of suitable age and discretion at the actual place of business" at the time of service. N.Y. C.P.L.R. § 308(2); *see Powell v. N.Y. State Dep't of Educ.*, No. 18-CV-7022 (RPK)(PK), 2022 WL 900605, at *12 (E.D.N.Y. Mar. 28, 2022).

Plaintiff filed affidavits of service indicating that on June 4, 2021, copies of summonses addressed to each defendant were personally delivered to 33 Beaver Street, 22nd Floor, New York, NY 10004, "the main office" for the TLC, and left with William Alexander, a security guard, who stated that he knew Mr. Goldapper and would give the documents to him. Goldapper is an attorney employed by TLC whom "as the authority would make sure all the defendants on the list" received the summonses. (Affidavits of Service, Dkt. 7; *see* Pl. Opp. at 1.) Sobers, Mateo, Kelly, and Hollingsworth were no longer employed by the TLC at that point (*see* Defs. Mem. in Support at 7), and there is no indication that Alexander or Goldapper were authorized by appointment or by law to receive service on behalf of those individuals.

Plaintiff argues that she "only ha[s] the information of all the defendants['] last place of employment . . . [and] do[esn't] have any place of residence of the defendants." (Pl. Opp. at 1.) Despite proceeding *pro se*, Plaintiff has an obligation to ensure that service is proper, including by requesting and obtaining the current place of employment or residence of each defendant if she could not deliver the summons and complaint to them each personally. *See Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 477 (2d Cir. 2006) ("*pro se* status 'does not exempt a party from compliance with relevant rules of procedural and substantive law" (quoting *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983)).

Because Plaintiff's method of service on Sobers, Mateo, Kelly, and Hollingsworth did not comply with Fed. R. Civ. P. 4(e) or N.Y. C.P.L.R. § 308(2), service on these defendants was not proper. (*See* Affidavits of Service at ECF pp. 12, 14, 17, 20.)

## B.    NYSHRL and NYCHRL Claims Barred by Election of Remedies Doctrine

Moving Defendants argue that any NYSHRL and NYCHRL claims arising out of incidents alleged in the SDHR Complaint should be dismissed as barred by the "election of remedies" doctrine. (Defs. Mem. in Supp. at 7-9.)

"Under the so called 'election of remedies' doctrine, a complainant who files a complaint with either the NYSDHR or [the New York City Commission on Human Rights (the 'NYCCHR')] cannot subsequently sue in court on the same claims." *Saudagar v. Walgreens Co.*, No. 18-CV-437 (KPF), 2019 WL 498349, at *7 (S.D.N.Y. Feb. 8, 2019) (alteration in original) (quoting *Bray v. N.Y.C. Dep't of Educ.*, No. 11-CV-7884 (DLC), 2013 WL 3481532, at *11 (S.D.N.Y. July 10, 2013)).

Section 297(9) of the New York Executive Law provides in relevant part, "Any person claiming to be aggrieved by an unlawful discriminatory practice shall have a cause of action in any court of appropriate jurisdiction … unless such person had filed a complaint hereunder or with any local commission on human rights . . . ." N.Y. Exec. Law § 297(9).  The NYCHRL contains a similar

provision.  *See* N.Y.C. Admin. Code § 8-502; *see also York v. Ass'n of Bar of City of N.Y.*, 286 F.3d 122,

127 (2d Cir. 2002) (discussion of the two provisions apply equally to each other).

"Thus, by the terms of the statute and code, respectively, the [NYSHRL] and [NYCHRL]

claims, once brought before the NYSDHR, may not be brought again as a plenary action in another

court."[13]  *Daniel v. ABM Indus., Inc.*, No. 16-CV-1300 (RA), 2017 WL 1216594, at *5 (S.D.N.Y. Mar.

31, 2017) (alterations in original) (quoting *York*, 286 F.3d at 127).  "[T]here is no question that the

election-of-remedies provisions at issue here apply to federal courts . . . ."  *York*, 286 F.3d at 127.

"Perhaps more importantly, '[t]he election of remedies bar is jurisdictional; a complaint that has

previously been dismissed by the NYSDHR or NYCCHR must be dismissed for lack of subject matter

jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1).'"  *Saudagar*, 2019 WL 498349, at *7

(quoting *Marecheau v. Equal Emp. Pracs. Comm'n*, No. 13-CV-2440 (VEC), 2014 WL 5026142, at *4

(S.D.N.Y. Sept. 30, 2014)).

Not only does a direct bar divest courts of subject matter jurisdiction over any NYSHRL and

NYCHRL claims previously submitted to the NYSDHR, but a derivative bar also "prevents courts

from hearing 'claims arising out of the same incident[s] on which [an NYSDRHR or NYCCHR]

complaint was based.'"  *Id.* (alteration in original) (quoting *Smith v. Sch. of Visual Arts*, No. 15-CV-8049

(RA), 2016 WL 3440553, at *2 (S.D.N.Y. June 9, 2016) (citations omitted)).  A claim does not need to

be identical to that raised previously to be barred; as long as there is "'a sufficient identity of issue[s] . . .

between' the claims a plaintiff pursued before the NYSHRL or NYCCHR, and those he alleges in a

---

[13] A litigant may bring a subsequent judicial action only "where the [NYSDHR] has dismissed such complaint [1] on the grounds of administrative convenience, [2] on the grounds of untimeliness, or [3] on the grounds that the election of remedies is annulled."  *Vargas v. Reliant Realty*, No. 13-CV-2341 (PGG), 2014 WL 4446165, at *8 (S.D.N.Y. Sept. 9, 2014) (alterations in original) (quoting N.Y. Exec. Law § 297(9)).  "Unless the claims are dismissed by the NYSDHR for one of the enumerated procedural reasons, the election of remedies provision under the NYSHRL poses an 'insuperable jurisdiction bar' to subsequently raising those same claims in federal court."  *Id.* (quoting *McDonald v. City of N.Y.*, 786 F. Supp. 2d 588, 615 (E.D.N.Y. 2011) (citation omitted)).

federal complaint, then the election of remedies doctrine precludes courts from adjudicating those federal claims." *Id.* (quoting *Rosario v. N.Y.C. Dep't of Educ.*, No. 10-CV-6160 (DLC), 2011 WL 1465763, at *2 (S.D.N.Y. Apr. 15, 2011)).  Thus, simply raising a new legal theory is not enough to escape the bar, "if that theory is premised on the same events underlying [plaintiff's] NYSDHR or NYCCHR complaint." *Id.*

Of the claims raised by Plaintiff in the Complaint, those premised on NYSHRL and NYCHRL—*i.e.*, discrimination, harassment, and retaliation based on gender and familial status (*see* Compl. at ECF pp. 9, 11)—were previously alleged in the SDHR Complaint.  (*See* SDHR Compl. ¶ 30 (charging that the TLC violated NYSHRL, NYCHRL and Title VII "based on familial status, gender, and retaliation").)  The direct bar prevents the Court from hearing those NYSHRL and NYCHRL claims.

Several of the remaining claims—*e.g.*, "forced resignation," "false (malingering) accusations," and "violation of seniority" (Compl. at ECF p. 9)—arise from the same incidents of discrimination and retaliation alleged in the SDHR Complaint.  (*See* SDHR Compl. ¶¶ 10, 22, 25.)  Thus, the derivative bar prohibits the Court from considering any NYSHRL and NYCHRL claims arising out of these incidents, which have already been submitted to the NYSDHR.

The Complaint alleges two additional sets of incidents, which were not included in the SDHR Complaint: that Plaintiff complained that car stops were not conducted pursuant to TLC policies and procedures in 2012, and that Defendant Joseph stormed out of meetings and refused to answer questions "[o]n three different occasions" and displayed unprofessional and hostile behavior toward Plaintiff "many times."  (Compl. at ECF p. 10.)  These additional allegations are covered by the election of remedies, since they also seem to relate to Plaintiff's allegations of discrimination and retaliation based on gender and familial status.  "The facts [in the two complaints] need not be perfectly identical, and merely adding some additional facts and/or re-labeling the claim will not prevent the

application of the doctrine of election of remedies." *Roache v. Long Island R.R.*, 487 F. Supp. 3d 154, 165 (E.D.N.Y. 2020) (quoting *Edner v. NYCTA-MTA*, 134 F. Supp. 3d 657, 667 (E.D.N.Y. 2015)); *see also Edner*, 134 F. Supp. 3d at 666-67 ("So long as 'substantially the same facts are involved, . . . the doctrine of election of remedies will bar any subsequent court proceedings.'" (omission in original) (quoting *DeBerry v. Brookdale Univ. Hosp. & Med. Ctr.*, 11 F. Supp. 3d 387, 392 (E.D.N.Y. 2014) (citations omitted))); *James v. Countrywide Fin. Corp.*, 849 F. Supp. 2d 296, 316 (E.D.N.Y. 2012); *Benson v. N. Shore-Long Island Jewish Health Sys.*, 482 F. Supp. 2d 320, 326 (E.D.N.Y. 2007).

Moreover, the fact that only the TLC was named as a respondent in the SDHR Complaint does not affect the applicability of the election of remedies doctrine. *See Benson*, 482 F. Supp. 2d at 326 ("[E]ven though the complaint names additional parties, because the incidents are identical, this Court lacks jurisdiction over the Plaintiff's NYSHRL claims against all the Defendants."); *accord James*, 849 F. Supp. 2d at 316. Because the present claims are based on the same facts as the claims raised in the SDHR Complaint, the election of remedies doctrine divests the Court of jurisdiction over any NYSHRL and NYSHRL claims against all Defendants.

Accordingly, the undersigned respectfully recommends that Plaintiff's NYSHRL and NYCHRL claims be dismissed for lack of subject matter jurisdiction.

## C.   Title VII Claims Partially Time-Barred

Moving Defendants argue that much of the alleged misconduct that could form the basis of a Title VII claim is time-barred.

Before a plaintiff may file a Title VII claim in federal court, she "must first pursue available administrative remedies . . . ." *James*, 849 F. Supp. 2d at 307 (quoting *Deravin v. Kerik*, 335 F.3d 195, 200 (2d Cir. 2003)). Title VII states in relevant part:

> A charge under this section shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred . . . , except that in a case of an unlawful employment practice with respect to which the person aggrieved has initially instituted proceedings with a State or local agency with authority to grant or seek relief

> from such practice . . . , such charge shall be filed by or on behalf of the person aggrieved within three hundred days after the alleged unlawful employment practice occurred . . . .

42 U.S.C. § 2000e-5(e)(1). "In New York, the SDHR 'has authority to remedy employment discrimination,' which makes New York a 'so-called deferral state' under Title VII." *James*, 849 F. Supp. 2d at 307 (quoting *Harris v. City of N.Y.*, 186 F.3d 243, 248 n.2 (2d Cir. 1999)). Thus, a New York plaintiff who initially files a charge with the SDHR must do so within 300 days after the occurrence of an unlawful practice; alleged misconduct which occurred prior to the 300-day limitations period is no longer actionable. *Id.*; *see also Sutter v. Dibello*, No. 18-CV-817 (SJF)(AKT), 2021 WL 930459, at *12 n.16 (E.D.N.Y. Mar. 10, 2021) (collecting cases).

Plaintiff filed the SDHR Complaint on October 21, 2019, stating that she "authorizes the New York State Division of Human Rights to accept this verified complaint on behalf of the Equal Employment Opportunity Commission ...." (*See* SDHR Complaint at ECF p. 25; SDHR Determination at 1.) Thus, only alleged misconduct occurring within 300 days of October 21, 2019—*i.e.*, on or after December 25, 2018—falls within Title VII's limitations period. *See James*, 849 F. Supp. 2d at 307-08.

## III.    Substantive Grounds for Dismissal

### A.    Gender Discrimination

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, prohibits employers from "discriminat[ing] against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of [her] . . . sex . . . ." 42 U.S.C. § 2000e-2(a)(1). The Pregnancy Discrimination Act of 1978, 42 U.S.C. § 2000e(k), "amend[ed] Title VII's definitional provision to make clear that Title VII's words 'because of sex' and 'on the basis of sex' include, but are not limited to, because of . . . pregnancy, childbirth, or related medical conditions." *Young v. United Parcel Serv., Inc.*, 575 U.S. 206, 226 (2015) (quoting 42 U.S.C. § 2000e(k)). Familial status is not a protected class

under Title VII.  *See Van Soeren v. Disney Streaming Serv.*, No. 19-CV-10196 (NRB), 2020 WL 6131255, at *3 (S.D.N.Y. Oct. 16, 2020); *see DeFranco v. Ametek Ameron, L.L.C.*, No. 12-CV-670 (DRH)(ETB), 2013 WL 992287, at *4 (E.D.N.Y. Mar. 13, 2013) (discrimination based on familial status alone is insufficient basis for a Title VII discrimination claim); *see also Pearlstein v. Staten Island Univ. Hosp.*, 886 F. Supp. 260, 266 n.5 (E.D.N.Y. 1995) ("Title VII, as amended by the Pregnancy Discrimination Act of 1978, 'does not protect people wishing to take child-rearing leaves as opposed to women seeking pregnancy leaves.'" (quoting *Record v. Mill Neck Manor Lutheran Sch. for the Deaf*, 611 F. Supp. 905, 907 (E.D.N.Y. 1985))).[14]

At the pleadings stage of a Title VII sex discrimination case, a plaintiff is not required to establish a *prima facie* case of discrimination under the framework set forth in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973).  *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 84 (2d Cir. 2015). However, "to defeat a motion to dismiss . . . , a plaintiff must plausibly allege that (1) the employer took adverse action against [her], and (2) [her] . . . sex . . . was a motivating factor in the employment decision."  *Id.* at 87.

"An adverse employment action is one which is more disruptive than a mere inconvenience or an alteration of job responsibilities."  *Id.* at 85 (quoting *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003)).  "A plaintiff sustains an adverse employment action if . . . she endures a materially adverse change in the terms and conditions of employment."  *Id.* (quoting *Galabya v. N.Y.C. Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000)).  "Examples of materially adverse changes include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material

---

[14]  By contrast, familial status is protected under both NYSHRL and NYCHRL, *see Rodriguez v. Metro Elec. Contractors, Inc.*, No. 18-CV-5140 (KAM), 2021 WL 848839, at *8 (E.D.N.Y. Mar. 5, 2021) ("[NYSHRL] makes it unlawful for an employer to discriminate on the basis of an 'individual's . . . familial status.'" (quoting N.Y. Exec. Law § 296(1)(a))); *Sanderson v. Leg Apparel L.L.C.*, No. 19-CV-8423 (GHW), 2020 WL 3100256, at *6 (S.D.N.Y. June 11, 2020) ("NYCHRL prohibits employers from discriminating 'because of . . . caregiver status.'" (quoting N.Y.C. Admin. Code. § 8-107(1)(a))).  Those claims are barred by the election of remedies doctrine, however, *see, supra*.

loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation." *Id.* (quoting *Terry*, 336 F.3d at 138).

"[I]t is axiomatic that mistreatment at work . . . is actionable under Title VII only when it occurs because of an employee's sex." *Gilbert v. Stony Brook Univ.*, No. 21-CV-2273 (BMC), 2022 WL 409716, at *6 (E.D.N.Y. Feb. 10, 2022) (omission in original) (quoting *Patane v. Clark*, 508 F.3d 106, 112 (2d Cir. 2007)). "An employee need only show that sex 'was a motivating factor for any employment practice, even though other factors also motivated the practice.'" *Lenzi v. Systemax, Inc.*, 944 F.3d 97, 108 (2d Cir. 2019) (quoting 42 U.S.C. § 2000e-2(m)).

Plaintiff alleges primarily that Defendants discriminated against her by not approving her change of tour requests. In response to Moving Defendants' argument that she failed to state a plausible gender discrimination claim, Plaintiff stated, "Defendants approved change of tours to at least four male officers due to pregnancies of girlfriends, fiancés or wives . . . . Some male officers [were] not given [the] same assignments as female officers . . . ." (Pl. Opp. at 2.) She also alleges that she was required to wear a uniform during her pregnancy and that she was treated differently from her male colleagues, who in August 2018 were granted a change of assignment to avoid street hail operations, and in June 2019 were permitted to leave early rather than assisting her with an arrest.[15] (SDHR Compl. ¶¶ 4, 15, 21.)

Actions that occurred before and during Plaintiff's pregnancy in 2013, as well as other alleged acts that occurred before December 25, 2018, are outside the statute of limitations period.

Even assuming, *arguendo*, that they are not time-barred, the alleged conduct does not constitute adverse employment actions. Defendants' requirement that she wear a uniform and their denials of

---

[15] Plaintiff makes several other allegations—*e.g.*, her negative performance evaluation for 2016, the TLC's failure to investigate the scratching of "LOSER" on her locker in August 2017, Goldapper's accusations of malingering in December 2017, and her unheeded complaints of safety concerns in 2012, 2018, and 2019—but she does not allege that these actions had any connection to discrimination based on gender, including her pregnancy.

Plaintiff's requests to change tours and departments are not tantamount to a materially adverse change to the terms and conditions of her employment. "Where assignments fall within the duties of a plaintiff's position, receiving unfavorable schedules or work assignments does not, without more, rise to the level of an adverse employment action." *Johnson v. Long Island Univ.*, 58 F. Supp. 3d 211, 224 (E.D.N.Y. 2014) (quoting *Williams v. Ford Motor Co.*, No. 12-CV-0411, 2014 WL 1572302, at *13 (W.D.N.Y. Apr. 18, 2014) (collecting cases)). Typically, an employer's refusal to grant an employee's shift change request is "a mere inconvenience," *Merisier v. Kings Cnty. Hosp.*, No. 15-CV-2739 (RRM)(RML), 2018 WL 1474176, at *12 (E.D.N.Y. Mar. 23, 2018), unless denial of a shift change "makes a normal life difficult" for the employee. *Id.* (quoting *Little v. Nat'l Broad. Co.*, 210 F. Supp. 2d 330, 377 (S.D.N.Y. 2002)). Here, notwithstanding her allegation that she was concerned for her safety or needed to care for her child, Plaintiff has not alleged facts that show how Defendants' denial of her change-of-tour requests made a normal life difficult for her, or why working the overnight tour was more than merely inconvenient.[16]

Similarly, although not time-barred, Plaintiff's allegation that in June 2019, Defendant Mateo required Plaintiff to arrest a taxi driver without a partner, equipment, or vehicle, while he permitted Plaintiff's male partner to leave work early rather than assist her in making the arrest, also does not rise to the level of an adverse employment action.

The only action alleged by Plaintiff which is not time-barred and could constitute an adverse employment action by Defendant is the 30-day unpaid suspension she received in July 2019.[17] However, Plaintiff fails to allege sufficient facts to show that gender was a motivating factor in this

---

[16] With regard to her request to be assigned to "light duty" due to her pregnancy, it appears that Plaintiff was accommodated by being assigned to the radio room. (See Compl. at ECF p. 9.)

[17] A constructive discharge could constitute a material adverse action. *See Fitzgerald v. Henderson*, 251 F.3d 345, 357-58 (2d Cir. 2001). Because Plaintiff raises this as a separate claim, it is discussed below.

employment decision. Her description of the events of July 25, 2019 and thereafter contains no suggestion that Defendants were motivated by her gender when they required her to deliver the arrest documents, told her that she was disobeying a direct order, took her shield and ID card, or placed her on suspension.

Accordingly, Plaintiff has not alleged sufficient facts to state a claim for gender discrimination under Title VII.

### B.   "Harassment" or Hostile Work Environment

"To state a claim for a hostile work environment in violation of Title VII, a plaintiff must plead facts that would tend to show that the complained of conduct: (1) 'is objectively severe or pervasive—that is, . . . creates an environment that a reasonable person would find hostile or abusive'; (2) creates an environment 'that the plaintiff subjectively perceives as hostile or abusive'; and (3) 'creates such an environment because of the plaintiff's sex.'" *Patane*, 508 F.3d at 113 (quoting *Gregory v. Daly*, 243 F.3d 687, 691-92 (2d Cir. 2001) (citations omitted)); *accord Boyar v. Yellen*, No. 21-507-CV, 2022 WL 120356, at *2 (2d Cir. Jan. 13, 2022). A court "must consider the totality of the circumstances, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Littlejohn v. City of N.Y.*, 795 F.3d 297, 321 (2d Cir. 2015) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). "Ultimately, to avoid dismissal under FRCP 12(b)(6), a plaintiff need only plead facts sufficient to support the conclusion that she was faced with 'harassment . . . of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse . . . .'" *Patane*, 508 F.3d at 113 (quoting *Terry*, 336 F.3d at 148).

In response to Moving Defendants' argument that she fails to state a plausible hostile work environment claim, Plaintiff states: "Incidents dating from 2013 shows a consistent pattern[ ] towards

[sic] TLC not following their own policies and procedures. Therefore creating a hostile environment. For example; Edwi[d]ge Joseph yelling [and] storming out of at least two meetings, a Hostile environment." (Pl. Opp. at 2.) In the Complaint, Plaintiff alleges that Joseph "has displayed unprofessional and hostile behavior" toward her "many times," specifically, that "[o]n three different occasions, he stormed out of meetings and refused to answer questions." (Compl. at ECF p. 10.) However, Plaintiff provides no dates for these actions, thus failing to plead that they occurred within the statute of limitations.

Several other allegations that might be characterized as creating a hostile work environment occurred in 2017 and are time-barred, *i.e.*, that Atuegbu shoved Plaintiff in the back and stated, "that's the way I play"; that Plaintiff was asked personal questions about her marital status; that the TLC failed to investigate vandalism perpetrated on her locker; that she attended a conference regarding a negative performance review; and that she was charged with excessive absenteeism. There is no allegation that Atuegbu continued "behaving aggressively" toward Plaintiff (*see* SDHR Compl. ¶ 6) or that any actions occurred after December 25, 2018 that could constitute continuing conduct. Title VII's statute of limitations "bars plaintiffs from bringing claims that accrued prior to the 300-day mark unless the plaintiff alleges a continuing violation. 'Under Title VII's continuing violation doctrine, if a plaintiff has experienced a continuous practice and policy of discrimination, the commencement of the statute of limitations period may be delayed until the last discriminatory act in furtherance of it.'" *Reyes v. Westchester Cty. Health Care Corp.*, No. 21-CV-0410, 2021 WL 4944285, at *4 (2d Cir. Oct. 25, 2021) (quoting *Washington v. Cty. of Rockland*, 373 F.3d 310, 317 (2d Cir. 2004)).

Even if they were not time-barred, these allegations, along with Plaintiff's remaining allegations of Defendants' conduct in 2018 and 2019—*e.g.*, that "harass[ing] and embarrass[ing]" notes were posted on the tour desk stating that she was not allowed to call out of work (SDHR Compl. ¶ 12); that she was required to work without a partner and directed to conduct operations requiring her

to stand long hours in poor conditions; that she was denied a change of tour request to care for her child—do not make out a claim for hostile work environment.

Plaintiff alleges that these incidents made her feel "embarrass[ed]" and "harass[ed]" (SDHR Compl. ¶ 12), "aggress[ed]" and "attacked" (SDHR Compl. ¶ 6; Compl. at ECF p. 11), "overwhelming[ly] anxious[ ]" and "extremely depressed." (Compl. at ECF p. 11.)

However, these incidents were not severe or pervasive enough to establish an objectively hostile work environment. To show that conduct was objectively severe or pervasive, a plaintiff "must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were 'sufficiently continuous and concerted' to have altered the conditions of her working environment." *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002) (citations omitted). Plaintiff's allegations demonstrate neither. None of the incidents was "extraordinarily severe," and the incidents were episodic rather than pervasive. In addition, Plaintiff does not allege that they unreasonably interfered with her work performance. *Cf. Boyar*, 2022 WL 120356, at *3 (plaintiff's allegations that his supervisor "(1) told him to go back to his desk or she would '[w]ring [his] neck'; (2) yelled at him demanding his employee identification number 'now'; (3) ignored him at a meeting; (4) yelled at him 'very loudly'; and (5) told him he had 90 minutes to complete two certification exams, when he had 60 minutes to complete each" did not suffice to state a plausible hostile work environment claim). The Second Circuit has made clear that "Title VII is not 'a general civility code' but rather 'forbids only behavior so objectively offensive as to alter the "conditions" of the victim's employment.'" *Agosto v. N.Y.C. Dep't of Educ.*, 982 F.3d 86, 102 (2d Cir. 2020) (quoting *Onacale v. Sundowner Offshore Servs.*, 523 U.S. 75, 81 (1998)). Plaintiff's allegations do not establish that her work environment was "so severely permeated with discriminatory intimidation, ridicule, and insult" as to support a hostile work environment claim. *Alfano*, 294 F.3d at 373.

Moreover, with the exception of Plaintiff's pregnancy-related allegations and conclusory allegations that some male officers were given assignments denied to her, Plaintiff does not allege that any of these incidents of unprofessionalism and hostility were motivated by discriminatory animus toward her.   "A single incident of yelling is hardly, if ever, sufficiently pervasive to create an 'environment' of hostility. . . . The law does not require employers to treat employees nicely, or even fairly. . . . The only action that federal law prohibits is action that which, as a threshold matter, is based on an employee's . . . protected characteristic." *Lewis v. N.Y. Homes and Cmty. Renewal*, No. 15-CV-5478 (BMC)(RLM), 2015 WL 5695643, at *3 (E.D.N.Y. Sept. 28, 2015); *see also Boyar*, 2022 WL 120356, at *3 ("A plaintiff must . . . demonstrate that . . . she was subjected to the hostility because of . . . membership in a protected class." (quoting *Brennan v. Metro. Opera Ass'n*, 192 F.3d 310, 318 (2d Cir. 1999))).

Accordingly, Plaintiff's allegations are insufficient to state a hostile work environment claim under Title VII.

### C.     "Forced Resignation" or Constructive Discharge

An "employee is constructively discharged when [her] employer, rather than discharging [her] directly, intentionally creates a work atmosphere so intolerable that [she] is forced to quit involuntarily." *Terry*, 336 F.3d at 151-52.  "[T]o state a prima facie case of constructive discharge, [a plaintiff] must establish that the constructive discharge 'occurred in circumstances giving rise to an inference of discrimination on the basis of . . . membership in [a protected] class.'" *Id.* at 152 (alterations in original) (quoting *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 91 (2d Cir. 1996)). "[A] constructive discharge cannot be proven merely by evidence that an employee disagreed with the employer's criticisms of the quality of her work . . . . Nor is the test merely whether the employee's working conditions were difficult or unpleasant." *Spence v. Md. Cas. Co.*, 995 F.2d 1147, 1156 (2d Cir. 1993).  "Rather, a plaintiff must establish that her employer made work 'so difficult or unpleasant that

a reasonable person in the employee's shoes would have felt compelled to resign.'" *Arbouin v. Bob's Discount Furniture, L.L.C.*, at *4 (E.D.N.Y. June 30, 2021) (quoting *Kirsch v. Fleet St., Ltd.*, 148 F.3d 149, 161 (2d Cir. 1998)), *R&R adopted*, 2021 WL 4458932 (E.D.N.Y. Sept. 29, 2021).

Although the question of whether an employee's resignation is tantamount to "constructive discharge" is normally analyzed in the context of whether such a resignation constitutes an adverse employment action, Plaintiff describes "forced resignation" as a separate claim, so it is considered separately here.

Plaintiff's allegations do not demonstrate that Defendants deliberately created working conditions so intolerable that any reasonable person in her position would have resigned. She also does not plausibly allege that Defendants' actions leading to termination of her employment were motivated by her membership in a protected class. "[A] constructive discharge cannot be shown simply by the fact that the employee was unhappy with the nature of her assignments . . . , or where the employee found the working conditions merely difficult or unpleasant." *Gilbert*, 2022 WL 409716, at *12 (quoting *Green v. Town of E. Haven*, 952 F.3d 394, 404 (2d Cir. 2020)). Plaintiff describes her stress and depression, stating that "[t]his unfair practice within TLC's workplace has left me with no other option than to resign for my own safety and well being." (Pl. Resignation Letter at ECF p. 33.) However, the facts which she alleges caused her stress—*e.g.*, the insubordination charge, working the overnight shift, being forced to take paperwork to the District Attorney's office rather than convey the information by fax or phone (*see id.*)—do not constitute a working environment that would cause any reasonable person to resign.

The standard for pleading a constructive discharge claim "is higher than the standard for establishing a hostile work environment" claim. *Gilbert*, 2022 WL 409716, at *12 (quoting *Fincher v. Depository Trust and Clearing Corp.*, 604 F.3d 712, 725 (2d Cir. 2010)); *accord Black v. Buffalo Meat Serv., Inc.*, No. 21-CV-1468, 2022 WL 2902693, at *2 (2d Cir. July 22, 2022). As Plaintiff has not pleaded

sufficient facts to establish the existence of a hostile work environment, her constructive discharge claim also fails. *See Gilbert*, 2022 WL 409716, at *12 (citing *Fincher*, 604 F.3d at 725).

Accordingly, Plaintiff's allegations fail to establish constructive discharge.

### D.    Retaliation

Title VII makes it "an unlawful employment practice for an employer to discriminate against any of [its] employees … because [she] has opposed any practice made an unlawful employment practice by this subchapter, or because [she] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). "[F]or a retaliation claim to survive . . . a motion to dismiss, the plaintiff must plausibly allege that: (1) defendants discriminated—or took an adverse employment action—against him, and (2) 'because' he has opposed any unlawful employment practice." *Vega*, 801 F.3d at 90 (citing 42 U.S.C. § 2000e-3(a)).

The definition of "adverse employment action" in the retaliation context under Title VII covers a broader range of conduct than in the Title VII discrimination context. *Id.* "Adverse employment action" means any action which "could well dissuade a reasonable worker from making or supporting a charge of discrimination," and "is not limited to discriminatory actions that affect the terms and conditions of employment." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57, 64 (2006).

With regard to causation, it is not enough that retaliation was a "substantial" or "motivating" factor in the employer's decision; a plaintiff must plausibly allege that the retaliation was a "but-for" cause of the employer's adverse action. *Vega*, 801 F.3d at 90-91 (citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013)). In the absence of direct evidence, "[t]he causal connection needed for proof of a retaliation claim 'can be established indirectly by showing that the protected activity was

closely followed in time by the adverse action.'" *Cifra v. Gen. Elec. Co.*, 252 F.3d 205, 217 (2d Cir. 2001) (citation omitted).

Plaintiff describes two protected activities which she contends resulted in adverse action against her: "participation as a potential witness in James McMillian's SDHR case" (SDHR Compl. ¶ 26) and her "second request for accommodation" to be assigned a morning shift "to take care of her child" (*id.* ¶ 27).

With regard to the first protected activity, Plaintiff alleges that in December 2017, she met with Goldapper, who "questioned [her] status with James McMillian" and when she asked a question, he responded, "Go ask Mr. McMillian." (Compl. at ECF pp. 10-11; *see* SDHR Compl. ¶ 10.)  In her Opposition, she argues that the TLC had "patterns of going against their own policies and procedures" and cited Goldapper's statement, "go ask McMillian," as an example.  (Pl. Opp. at 2.)  Plaintiff contends that McMillian "was never indicated to [Plaintiff] he was a supervisor" and "[o]nly Mr. Goldapper can answer why that statement was said."  (*Id.*)

Participation in a discrimination case brought by someone else can constitute a protected activity.  *See Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 175 (2d Cir. 2005) (Plaintiff's offer to testify in support of co-worker's discrimination suit against their employer was protected activity even though she was never called on to testify; "Congress chose to provide wide-ranging protection … [to] an employee who 'participate[s] in any manner' in a Title VII proceeding." (second alteration in original) (quoting 42 U.S.C. §2000e-3(a))).  However, Plaintiff does not indicate who McMillian is, whether he was employed by the TLC, whether his discrimination case was against the TLC, or when he brought his case.  And although Plaintiff suggests that Goldapper was aware of McMillian's SDHR case, she also concedes that she does not know what he meant when he told her to "go ask McMillian."

Assuming, *arguendo*, that Plaintiff engaged in protected activity by participating in a discrimination case against the TLC, and that the TLC was generally aware that she did so.  *See Meyer*

30

*v. McDonald*, 241 F. Supp. 3d 379, 392 (E.D.N.Y. 2017) ("nothing more 'than general corporate knowledge that the plaintiff has engaged in a protected activity' is necessary" (quoting *Kessler v. Westchester Cnty. Dep't of Soc. Servs.*, 461 F.3d 199, 210 (2d Cir. 2006)), Plaintiff does not provide any evidence of causation, either direct or indict. Plaintiff provides no direct evidence of retaliatory animus toward Plaintiff. *See Redd v. N.Y. State Div. of Parole*, 923 F. Supp. 2d 371, 385 (E.D.N.Y. 2012) ("'Direct evidence' is 'evidence tending to show, without resort to inference, the existence of a fact in question.'" (quoting *Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176, 1183 (2d Cir. 1992))). For example, other than the ambiguous statement, "go ask McMillian," Plaintiff does not allege any comments about her participation in protected activity.

Plaintiff also fails to show indirect causation, such as by showing that Defendants' adverse action against her followed her protected activity closely in time. Plaintiff alleges that Defendants knew of her involvement in McMillian's discrimination case as early as December 2017 when the meeting with Goldapper occurred. (Compl. at ECF p. 10.) Plaintiff appears to argue that Goldapper's accusations against her were in retaliation for her participation in McMillian's discrimination case, and that Goldapper's statements during the conference show that he was aware of her protected activity. However, without any factual allegation as to when Plaintiff participated in McMillian's case or when Defendants first became aware of her involvement in that protected activity, the Court cannot ascertain whether there is sufficient temporal proximity to provide indirect proof of causation. *See Harper v. Brooklyn Children's Ctr.*, No. 12-CV-4545 (SJF)(GRB), 2014 WL 1154056, at *4 (E.D.N.Y. Mar. 20, 2014) ("[F]or purposes of determining temporal proximity, the relevant period 'is measured from the date of the "employer's knowledge of [the] protected activity."'" (quoting *Kim v. Columbia Univ.*, 460 F. App'x 23, 25 (2d Cir. 2012) (citation omitted))).

Beyond Goldapper's allegedly false accusations, Plaintiff does not specify how and when Defendants retaliated against her. (*See* SDHR Compl. ¶ 26.) Although Plaintiff's eventual suspension

31

in July 2019 was an adverse action, *see Hunt v. Con Edison Co. N.Y.C.*, No. 16-CV-0677 (MKB), 2016 WL 8711358, at *6 (E.D.N.Y. May 20, 2016) (collecting cases), the time between that action and Goldapper's comment indicating knowledge of her protected activity was a gap of approximately 19 months.  The Second Circuit "has not drawn a bright line defining … the outer limits beyond which a temporal relationship is too attenuated to establish causation," *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010), but it has found a "temporal gap of almost two years between the date of th[e] protected activity and the alleged retaliation [to be] too great to give rise to an inference of causation." *Harrison v. U.S. Postal Serv.*, 450 F. App'x 38, 41 (2d Cir. 2011) (citation to summary order); *see also Clark Cnty. Sch. Dist. V. Breeden*, 532 U.S. 268, 273 (2001) ("The cases that accept mere temporal proximity . . . as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close.'  Action taken . . . 20 months later suggests, by itself, no causality at all." (citations omitted)); *Shields v. NYC Health & Hosps. Corp.*, 489 F. Supp. 3d 155, 165 (E.D.N.Y. 2020) ("Courts in this circuit have consistently found … that a period of greater than three months is too attenuated to provide a basis to infer retaliation." (citing *Moore v. Verizon*, No. 13-CV-6467 (RJS), 2016 WL 825001, at *15 (S.D.N.Y. Feb. 5, 2016) (collecting cases))).

Plaintiff's second basis for her retaliation claim, that she engaged in protected activity when she requested an accommodation based on childcare needs, does not constitute protected activity under Title VII.  A claim for retaliation under Title VII can be based on a request for reasonable accommodation.  However, the request must be based on an employee's membership in a protected class.  *See, e.g., Jenkins v. N.Y. City Transit Auth.*, 646 F. Supp. 2d 464, 473 (S.D.N.Y. 2009) (request for accommodation of religious beliefs was protected activity); *Gratton v. Jetblue Airways*, No. 04-CV-7561 (DLC), 2005 WL 1251786, at *10 (S.D.N.Y. May 25, 2005) (request for accommodation of pregnancy was protected activity).  Plaintiff's second request for accommodation was not based on pregnancy or gender, but on her childcare needs.  It was, therefore, not a protected activity because familial status,

in itself, is not a protected class under Title VII.  *See* 42 U.S.C. 2000e-2(a)(1) ("It shall be an unlawful employment practice for an employer … to discriminate against any individual … because of such individual's race, color, religion, sex, or national origin . . . ."); *DeFranco*, 2013 WL 992287, at *4.

Accordingly, Plaintiff's allegations cannot establish a claim for retaliation under Title VII.

### E.      Violation of Seniority

Plaintiff alleges that at a conference with Torres and Kelly in 2019, her request to be assigned to the morning tour so she could care for her child was denied even though she "ha[d] seniority over the officers assigned to the morning tour."  (SDHR Compl. ¶ 22.)  Plaintiff alleges that the tour assignments should have been "determined based on seniority, activity and time and leave."  (Compl. at ECF p. 11.)  In her Opposition, Plaintiff states, "Plaintiff's squad was split up, two officers to over night and the rest to morning squad.  Seniority was one of the factors.  Plaintiff and one other officer had seniority on the whole squad.  Plaintiff was placed on an overnight tour."  (Pl. Opp. at 3.)

The undersigned construes Plaintiff's violation of seniority claim to be an argument that denial of her request in violation of TLC policy, which based tour assignments on factors including seniority, constituted discriminatory conduct toward her.

As discussed above, denial of a shift assignment does not constitute an adverse employment action, which is a necessary predicate for a discrimination claim under Title VII.

Accordingly, Plaintiff has not alleged sufficient facts to state a claim for violation of seniority.

### F.      "Defamation of Character"

"Under New York law, defamation comprises both slander (for injurious spoken statements) and libel (for injurious written statements). . . . Both types of claims require pleading the same basic elements: (1) a defamatory statement of fact about the plaintiff; (2) publication to a third party; (3) fault by the defendant; (4) falsity of the statement; and (5) special damages or per se actionability."  *Oakley v. Dolan*, 833 F. App'x 896, 899 (2d Cir. 2020) (citation to summary order).

Plaintiff argues that the TLC defamed her by falsely "inform[ing] NYS Division of [Criminal] Justice Services [that] Plaintiff ceased to serve the [TLC] due to incompetence or misconduct." (Pl. Opp. at 3.) She states that "[i]f [P]laintiff continues her employment in law enforcement this can affect future careers." (*Id.*)

In its letter dated May 26, 2020, the DCJS states that the TLC notified it on April 21, 2020 that Plaintiff's employment was terminated "due to incompetence or misconduct." (DCJS Letter at ECF p. 30.) The DCJS Letter further informs Plaintiff that, as a result, her peace officer basic training certification was invalidated.

Pursuant to New York State regulations, in order for the DCJS to maintain the Central State Registry of Police Officers and Peace Officers, an employer of police and peace officers, such as the TLC, must report to DCJS when a TLC officer ceases to serve and to provide the reason. *See* N.Y. Comp. Codes R. & Regs. tit. 9 §§ 6056.1, 6056.4(c) ("Each employer shall . . . , with respect to each police or peace officer employed by it, immediately notify the division when such officer ceases to serve and the reason for such . . . .").[18]

The TLC reported to the DCJS that Plaintiff "ceased to serve … due to incompetence or misconduct pursuant to section 9 NYCRR Part 6056.2(h)." (DCJS Letter at ECF p. 30.) Because the pre-amendment version of § 6056.2(h) in effect at the time of TLC's reporting provides a definition for "[r]emoval during a probationary period" ("a probationary period not successfully completed due to conduct that would have resulted in removal of a permanent employee pursuant to subdivision (g) of this section"), and Plaintiff completed her probationary period in July 2013 (Compl. at ECF p. 10),

---

[18] In connection with the implementation of the New York State Professional Policing Act of 2021, § 6056 was amended as of October 16, 2021, to "redefine removal for cause and establish a process for [the DCJS] to correct any material inaccuracy reported by a law enforcement agency which affects the certification standing of an officer." 43 N.Y. Reg. 5 (Oct. 20, 2021). The TLC notified the DCJS of the termination of Plaintiff's service on April 21, 2020. Accordingly, the pre-amendment version of § 6056 which was effective on that date is applicable here.

subdivision (h) is not applicable and erroneously cited. Subdivision 6056.2(g) does pertain to removal for "incompetence or misconduct," the term used in the DCJS Letter, and is therefore, construed to be the intended and applicable subdivision. Section 6056.2(g) states in relevant part, "Removal for cause of a full-time or part-time employee means removal for incompetence or misconduct:…(2) by an employee's resignation or retirement while a disciplinary process has commenced . . . which may result in removal." N.Y. Comp. Codes R. & Regs. tit. 9 § 6056.2(g)(2). Thus, if a TLC officer resigns while a disciplinary action is pending against her, the TLC is required by law to report that she was removed "for cause," *i.e.*, "for incompetence or misconduct." The law defines "for incompetence or misconduct" as resignation during the pendency of certain disciplinary processes.

Plaintiff's submissions indicate that, despite an offer from the TLC that she settle her disciplinary charges, she resigned while disciplinary charges were still pending against her. (*See* SDHR Compl. ¶ 25 ("There remain pending falsified disciplinary charges against [Plaintiff]."); Pl. Resignation Letter at ECF p. 32 (stating her refusal to sign settlement of pending charges).)

Because Plaintiff resigned while disciplinary actions were pending against her, the TLC was required by the applicable New York State regulations to report that she was removed for "incompetence or misconduct"—as those terms are defined by the regulations. Thus, despite Plaintiff's allegation that TLC's defamatory statement about her is false, Plaintiff's submissions show that the statement is true as a matter of law.

Accordingly, Plaintiff fails to allege facts sufficient to state a claim for defamation.

G.    **"False (Malingering) Accusations"**

The undersigned construes Plaintiff's claim of false accusations of malingering as connected to her retaliation claim, *i.e.*, that these accusations were made in retaliation for her engaging in a protected activity. Plaintiff states that "Goldapper falsely accused [her] of falsifying sick notes and

faking illnesses" (SDHR Compl. ¶¶ 10, 27) and falsely "charged [her] with [m]alingering." (Compl. at ECF p. 10.)

These accusations were alleged to have occurred during a meeting in December 2017 (SDHR Compl. ¶ 10); therefore, they fall outside the 300-day limitations period for Plaintiff's Title VII claims, which bars claims based on conduct that occurred before December 25, 2018. (SDHR Compl. ¶ 10; *see* SDHR Determination at 1; 42 U.S.C. § 2000e-5(e)(1).) Moreover, as discussed above, Plaintiff has alleged insufficient facts to connect these accusations to either gender or her participation in a protected activity.

Accordingly, Plaintiff's purported claim for false accusations is time-barred and insufficiently alleged.

### H.    "Perjury"

Plaintiff alleges "dishonesty in sworn court affidavits" and "dishonesty told in sworn statements (perjury) by agency supervision." (Compl. at ECF pp. 8, 11.) However, she does not identify or attach any sworn statements or affidavits. She also does not specify what statements she alleges to be false. Federal Rule of Civil Procedure 9(b) requires allegations of fraud to be "pled with particularity and 'specify the time, place, speaker, and content of the alleged misrepresentations.'" *Inspired Cap., L.L.C. v. Condé Nast*, 803 F. App'x 436, 440 (2d Cir. 2020) (citation to summary order) (quoting *Caputo v. Pfizer, Inc.*, 267 F.3d 181, 191 (2d Cir. 2001)). This "heightened pleading requirement 'serves to provide a defendant with fair notice of a plaintiff's claim, safeguarding his reputation from improvident charges of wrongdoing, and protect him against strike suits.'" *Id.* (quoting *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007)).

To the extent this claim is connected to the defamation claim, Plaintiff has not shown that any statement made by the TLC to the DCJS was "sworn." In addition, the Complaint lacks specificity as to the content of any other false statements along with the time, place, and manner in which they were

made.  It, therefore, fails to give Defendants the notice they need to defend themselves against such a claim.

Accordingly, Plaintiff's allegations are insufficient to state a claim for perjury.

**I.     "Violation of Human Rights"**

Plaintiff makes a general allegation that her human rights were violated.

Aside from the allegations already addressed above, it appears that Plaintiff is arguing in this claim that during the conference with Goldapper in 2017, although he said she could ask a question, he "took [her] human rights to ask a question."  (Compl. at ECF pp. 10-11.)  She also claims that her human rights were violated by Andrews and Joseph in July 2019 when they demanded her shield and ID card without an explanation, which "violated [her] human rights and [her] rights as an officer of the City of New York."  (Compl. at ECF p. 11.)  In her resignation letter, Plaintiff states that Defendants' "mistreatment" of her "started as [she] began standing up for [her] safety, which is [her] human right."  (Pl. Resignation Letter at ECF 33.)  Finally, in her letter to the DCJS, Plaintiff wrote that, "Reporting the mistreatment and wrong doings [sic] were all ignored and held against me.  I was retaliated against and decided to take legal action due to my Human Rights being violated."  (Pl. Letter to DCJS at 1.)

None of these allegations state a separate claim for violation of human rights aside from the Title VII claims discussed above.  Plaintiff's allegations are conclusory and insufficient to state a cognizable cause of action.  To the extent that Plaintiff is making a claim under the NYSHRL and NYCHRL, those claims are barred by the election of remedies doctrine, discussed *supra*.

Accordingly, Plaintiff has failed to state a claim for violation of human rights.

**J.     "Improper & State Investigation"**

Plaintiff does not specify the "state investigation" she is challenging in her purported claim for "improper [] state investigation."  The only potential "state investigation" referenced in the

Complaint is by the SDHR, which dismissed Plaintiff's SDHR Complaint with a finding of "no probable cause." (SDHR Determination at 1.) The Complaint states that it "is filed against not only the Taxi & Limousine Commission but now also the New York State Division of Human Rights (EEOC), FOR NEGLECT and INCOMPETENCE. Judy A. Keenan, the District Director is completely responsible for allowing those who investigated my case in finding 'No Probable Cause.'" (Compl. at ECF p. 9.) Keenan is the District Director of the EEOC who signed the Right to Sue Letter. (Compl. at ECF p. 45.)

Moreover, Plaintiff does not name the SDHR or Keenan in the section of the Complaint which requires identification of "each defendant." (*See* Compl. at ECF pp. 2-6.) They are not identified in the section requesting that summonses be issued for "all defendants." (*See* Compl. at ECF p. 13.) They also do not appear on the "List of Defendants" attached to the Complaint. (*See* Dkt. 1-1.) Therefore, these are not properly named defendants.

Plaintiff provides no facts in support of any cognizable claim against the SDHR or Keenan. Any challenge to the SDHR Determination was required to be by appeal to the New York Supreme Court within 60 days of the decision or pursuant to the Right to Sue Letter after the EEOC adopted the SDHR's findings. (*See* SDHR Determination at 2-3; Compl. at ECF p. 45.) Plaintiff has stated no other basis for a claim based on "improper state investigation."

Accordingly, Plaintiff fails to state a claim for "improper [] state investigation."

**K.     FMLA**

Plaintiff makes factual allegations in the SDHR Complaint regarding her requests for medical leave under FMLA, but she does not specify a claim for FMLA violation in the Complaint.

Moving Defendants argue that any FMLA claim should be dismissed because Plaintiff fails to allege that she was eligible for FMLA leave and that she complied with FMLA's notice requirements.

"Plaintiff may advance a FMLA action on two different theories: 'interference' and 'retaliation.'" *Emmons v. City Univ. of N.Y.*, 715 F. Supp. 2d 394, 417 (E.D.N.Y. 2010) (citing *Potenza v. City of N.Y.*, 365 F.3d 165, 167 (2d Cir. 2004)).

### 1.   *"Interference" Theory of Liability*

"In the Second Circuit, a plaintiff must plead the following elements to state a claim of interference under the FMLA: '1) that she is an eligible employee under the FMLA; 2) that the defendant is an employer as defined by the FMLA; 3) that she was entitled to take leave under the FMLA; 4) that she gave notice to the defendant of her intention to take leave; and 5) that she was denied benefits to which she was entitled under the FMLA.'" *De Figueroa v. New York*, 403 F. Supp. 3d 133, 155 (E.D.N.Y. 2019) (quoting *Graziadio v. Culinary Inst. of Am.*, 817 F.3d 415, 424 (2d Cir. 2016)).

"In order to be eligible for FMLA benefits, an employee must have been employed for at least twelve months with an employer and have worked at least 1,250 hours in the twelve months preceding the date on which eligibility is determined." *Woodford v. Cmty. Action of Greene Cnty., Inc.*, 268 F.3d 51, 54 (2d Cir. 2001) (citing 29 U.S.C. § 2611(2)(A)). "The determination of whether an employee . . . [is eligible] must be made as of the date the FMLA leave is to start." *Smith v. Westchester Cnty.*, 769 F. Supp. 2d 448, 465 (S.D.N.Y. 2011) (alteration in original) (quoting 29 C.F.R. § 825.110(d)). "Eligibility is a threshold issue, and it is insufficient for Plaintiff to 'merely assert[ ] in a conclusory manner that he is eligible without stating any facts that relate to the definition of an eligible employee.'" *Id.* (quoting *Spurlock v. NYNEX*, 949 F. Supp. 1022, 1033 (W.D.N.Y. 1996)).

Plaintiff does not allege any facts relating to FMLA's definition of an eligible employee, including the specific dates for which she requested leave, and how many hours she worked in the twelve months preceding the date her leave would have started. *See Arroyo-Horne v. City of N.Y.*, 831 F. App'x 536, 539 (2d Cir. 2020) (citation to summary order) (affirming dismissal of FMLA claim

where plaintiff did not allege that she had worked 1,250 hours in the 12-month period prior to her requests for FMLA leave); *Daly v. Westchester Bd. of Legislators*, No. 19-CV-4642 (PMH), 2021 WL 229672, at *11 (E.D.N.Y. Jan. 22, 2021) (dismissing FMLA claims where plaintiff did not plead that he had worked at least 1,250 hours in the 12 months before his anticipated FMLA leave; allegation that plaintiff was employed full-time by employer did not suffice).

In addition, FMLA entitles an eligible employee to "12 workweeks of leave during any 12-month period . . . [b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). "FMLA defines 'serious health condition' as 'an illness, injury, impairment, or physical or mental condition that involves – (A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider.'" *Brown v. Omega Moulding Co.*, No. 13-CV-5397 (SJF)(ARL), 2014 WL 4439530, at *4 (E.D.N.Y. Sept. 9, 2014) (quoting 29 U.S.C. § 2611(11), and citing 29 C.F.R. § 825.113). "Where absences are not attributable to a 'serious health condition,' . . . FMLA is not implicated and does not protect an employee against disciplinary action based upon such absences." *Id.* at *5 (quoting *Rankin v. Seagate Techs., Inc.*, 246 F.3d 1145, 1147-48 (8th Cir. 2001)).

Plaintiff only alleges that she sought FMLA leave "to treat an illness." (SDHR Compl. ¶ 11.) She does not allege any facts to show that she was entitled to FMLA leave because of a "serious health condition," as defined by the FMLA. *See Diby v. Kepco Inc.*, No. 16-CV-583 (KAM)(LB), 2016 WL 5879595, at *3 (E.D.N.Y. Oct. 7, 2016) (finding FMLA interference claim deficient where plaintiff did not allege sufficient facts regarding the nature of her health condition). Neither the Complaint nor documents attached to it provide any information about the illness for which Plaintiff requested FMLA leave. Thus, Plaintiff fails to allege that she was eligible for FMLA leave based on a "serious health condition."

Because Plaintiff fails to allege sufficient facts to show her eligibility for FMLA leave, she fails to state an interference claim under FMLA.

### 2. *"Retaliation" Theory of Liability*

"FMLA prohibit[s] employers from 'us[ing] the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions, or disciplinary actions.'" *Dennis v. Ultimus Fund Sols., L.L.C.*, No. 20-CV-2813 (NGG)(AYS), 2021 WL 3566593, *3 (E.D.N.Y. Aug. 12, 2021) (second alteration in original) (quoting *De Figueroa*, 403 F. Supp. 3d at 153). "To state an FMLA retaliation claim, a plaintiff must plausibly plead that '(1) [she] exercised rights protected under the FMLA, (2) [she] was qualified for [her] position, (3) [she] suffered an adverse employment action, and (4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent.'" *Tiffany v. Dzwonczyk*, 696 F. App'x 7, 8 (2d Cir. 2017) (citation to summary order) (quoting *Donnelly v. Greenburgh Cent. Sch. Dist. No. 7*, 691 F.3d 134, 147 (2d Cir. 2012)). "To survive a motion to dismiss a FMLA retaliation claim, a plaintiff must carry a 'minimal' burden of pleading that [she] [was] subject to FMLA retaliation." *Dennis*, 2021 WL 3566593, at *3 (quoting *Robles v. Medisys Health Network, Inc.*, No. 19-CV-6651 (ARR)(RML), 2020 WL 3403191, at *19 (E.D.N.Y. June 19, 2020)).

"A threshold issue for both FMLA interference claims and FMLA retaliation claims is whether an employee is eligible under the statute to claim its protections." *Arroyo-Home*, 831 F. App'x at 539 (citing *Graziadio*, 817 F.3d at 424; *Potenza*, 365 F.3d at 168); *accord DeLeon v. Teamsters Loc. 802, L.L.C.*, No. 20-CV-24 (RRM)(PK), 2021 WL 1193191, at *14 (E.D.N.Y. Mar. 29, 2021). As discussed above, Plaintiff has not pleaded facts plausibly establishing that she was an "eligible employee" under FMLA. Thus, her retaliation claim should likewise be dismissed. *See Bernheim v. N.Y. City Dep't of Educ.*, No. 19-CV-9723 (VEC)(JLC), 2021 WL 2619706, at *6 (S.D.N.Y. June 25, 2021), *R&R adopted*, 2021 WL 4198126 (S.D.N.Y. Sept. 15, 2021); *DeLeon*, 2021 WL 1193191, at *14-15; *Daly*, 2021 WL 229672, at *12.

Even if Plaintiff's allegations surmount the threshold issue of eligibility, her retaliation claim fails because she does not allege that she suffered an adverse employment action.

"[F]or purposes of the FMLA's anti-retaliation provision, a materially adverse action is any action by the employer that is likely to dissuade a reasonable worker in the plaintiff's position from exercising [her] legal rights." *Davies v. N.Y. City Dep't of Educ.*, 563 F. App'x 818, 820 (2d Cir. 2014) (citation to summary order) (quoting *Millea v. Metro-North R.R. Co.*, 658 F.3d 154, 164 (2d Cir. 2011)). "[A]n adverse employment action is a '"materially adverse change" in the terms and conditions of employment.'" *Id.* (quoting *Galabya*, 202 F.3d at 640 (citations omitted)). "Such a change 'might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation.'" *Id.* (quoting *Weeks v. N.Y. State (Div. of Parole)*, 273 F.3d 76, 85 (2d Cir. 2001), *abrogated on other grounds by Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002)). "[P]etty slights, minor annoyances, and simple lack of good manners will not give rise to actionable retaliation claims." *Id.* (quoting *Millea*, 658 F.3d at 165). "In determining whether conduct amounts to an adverse employment action, the alleged acts of retaliation need to be considered both separately and in the aggregate, as even minor acts of retaliation can be sufficiently 'substantial in gross' as to be actionable." *De Figueroa*, 403 F. Supp. 3d at 157 (quoting *Smith v. N. Shore-Long Island Jewish Heath Sys.*, 286 F. Supp. 3d 501, 512 (E.D.N.Y. 2018)).

Even assuming, *arguendo*, that Plaintiff's allegations establish that she exercised rights protected under FMLA and that she was qualified for her position, Plaintiff fails to allege that she suffered an adverse action. She alleges that after she filed for FMLA leave in 2018 to treat an illness, Chief Joseph "refused to allow [her] to exercise her rights under FMLA leave." (SDHR Compl. ¶ 12.) "Later," the TLC posted notes on the tour desk stating that Plaintiff was not allowed to call out of work and that

any of her "call outs" must be directed to a supervisor.  (*Id.*)  Plaintiff alleges that these notes were visible to her colleagues and represented "an effort to harass and embarrass her."  (*Id.*)

The posting of these notes amounted to a "petty slight" at most, and it is unlikely that a reasonable employee in Plaintiff's position would be dissuaded from exercising her FMLA rights. Recognizing that a "less demanding standard" applies to determining what constitutes a "materially adverse action" in the FMLA retaliation context, courts in this Circuit have found the following employer actions sufficient:  negative performance evaluations, warning letters, denials of transfers to other positions, and transfers to positions with diminished responsibilities.  *See Ziccarelli v. NYU Hosps. Ctr.*, No. 15-CV-9307 (JGK), 2021 WL 797668, at *7 (S.D.N.Y. Feb. 27, 2021) (collecting cases).  The posting of these notes describing the procedure Plaintiff must follow to call out sick do not rise to the level of seriousness of these other activities.

Because Plaintiff fails to allege that she is an eligible employee under FMLA and that she suffered an adverse action, Plaintiff's allegations are insufficient to state a retaliation claim under FMLA.

## IV.    Futility of Amendment

Although "a *pro se* litigant should be 'grant[ed] leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated,'" *Malcolm v. Ass'n of Supervisors & Adm'rs of Rochester*, 831 F. App'x 1, 5 (2d Cir. 2020) (citation to summary order) (quoting *Chavis v. Chappius*, 618 F.3d 162, 170 (2d Cir. 2010)), "leave to amend a complaint may be denied when amendment would be futile," *Jackson v. Wells Fargo Home Mortg.*, 811 F. App'x 27, 30 (2d Cir. 2020) (citation to summary order) (quoting *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014)).

Because any claims under NYSHRL and NYCHRL are barred by the election of remedies doctrine, any amendment as to those claims would be futile.

Any Title VII discrimination, retaliation and hostile work environment claims based on conduct that occurred before December 25, 2018 are time-barred, and therefore, any amendments based on such actions would be futile.

To the extent that Plaintiff has a good faith basis for providing additional information regarding conduct occurring on or after December 25, 2018, including specific dates, that would cure the deficiencies in the Complaint as set forth in this Report and Recommendation, I respectfully recommend that Plaintiff be granted the opportunity to do so. *See DeFranco*, 2013 WL 992287, at *6 (granting defendant's motion to dismiss and directing plaintiff to file, within 30 days of order granting motion to dismiss, pre-motion conference letter specifying additional facts which would be plead— with plaintiff's opportunity to request leave to move to amend the complaint to be deemed waived if plaintiff does not timely file the letter).

The undersigned notes that Title VII claims can only be brought against an employer, not individuals. *See Miller v. N.Y. State Police*, No. 20-CV-3976, 2022 WL 1133010, at *1 n.1 (2d Cir. Apr. 18, 2022) (citation to summary order) (citing *Mandell v. Cnty. of Suffolk*, 316 F.3d 368, 377 (2d Cir. 2003)). Therefore, if Plaintiff amends the Complaint to bring Title VII claims only, it would not be appropriate to name individual defendants.

## CONCLUSION

Based on the foregoing, I respectfully recommend that the Motion to Dismiss be GRANTED and that the Complaint be dismissed without prejudice.[19] Additionally, I respectfully recommend that Plaintiff be granted an opportunity to amend the Complaint with the limitations described above.

Any written objections to this Report and Recommendation must be filed within fourteen (14) days of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).

---

[19] Because Plaintiff did not state a cause of action against any defendant, I respectfully recommend that the case against Defendants Sobers, Mateo, Kelly, and Hollingsworth be dismissed *sua sponte*.

Failure to file objections within the specified time waives the right to appeal any order or judgment entered based on this Report and Recommendation. *Caidor v. Onondaga Cnty.*, 517 F.3d 601, 604 (2d Cir. 2008).

**SO ORDERED:**

*Peggy Kuo*

PEGGY KUO
United States Magistrate Judge

Dated:    September 7, 2022
          Brooklyn, New York